**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

HAYLEY HOWE,

                        Plaintiff,

v.

WULF KAAL,

EMERGING TECHNOLOGY ASSOCIATION,
and

JOHN DOE #1-35,

                        Defendants.

Civil No. 25-1946 (JRT/ECW)

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS**

---

Anne St. Amant, Lukas Boehning, and Pamela Abbate Dattilo, **ECKLAND & BLANDO LLP**, 100 Washington Avenue South, Suite 1500, Minneapolis, MN 55401, for Plaintiff.

Sheila A Engelmeier and Thomas E Marshall, **ENGELMEIER & UMANAH**, 121 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for Defendants Wulf Kaal and Emerging Technology Association.

Plaintiff Hayley Howe filed an eleven-count Complaint against Wulf Kaal, her former mentor and law professor; Emerging Technology Association ("ETA"), a Swiss entity co-founded by Kaal that Howe performed legal work for; and 35 John Does that are also associated with ETA. Defendants Kaal and ETA move to dismiss. The Court will grant in part and deny in part Defendants' motion to dismiss.

**BACKGROUND**

I.    **FACTS**

Howe seeks damages from Defendants for events that occurred "within the scope of Plaintiff Howe's employment with the Emerging Technology Association, under the general supervision and oversight of Wulf Kaal." (Compl. ¶ 1.)  The facts here are recited as alleged in Howe's complaint.

Howe is a Minnesota citizen (*id.* ¶ 7); Kaal, a professor at University of St. Thomas School of Law (located in Minnesota), is an Illinois citizen (*id.* ¶ 8); and ETA is a Swiss association that operates "throughout the United States," including in Minnesota (*id.* ¶ 9). ETA is the "legal wrapper" for DEVxDAO (*id*. ¶ 10), which is a "decentralized autonomous organization ('DAO') . . . that operates on blockchain software and is run by those who have obtained voting power via sweat equity towards a shared purpose" (*id.* ¶ 37).  The "shared purpose" of DEVxDAO is "to provide grants to developers internationally to support blockchain-based projects."  (*Id.* ¶ 38.)  Because DEVxDAO is unincorporated, it uses ETA as "a legal wrapper to enter into contracts on its behalf and manage funds."  (*Id.* ¶ 39.)

Howe includes John Does #1–35 as Defendants, because "[g]iven DEVxDAO's novel structure . . . certain current or former individual voting associates," the decisionmakers in DEVxDAO, are "presently unknown or unidentifiable."  (*Id.* ¶ 11; *see also id.* ¶ 42.)  All matters within DEVxDAO were voted on in a "forum-style public portal," with each voting

associate having a vote. (*Id.* ¶ 42.) Each voting associate "received monthly compensation . . . paid by ETA . . . ." (*Id.*)

### A. Howe's Initial Involvement with ETA

Howe attended the University of St. Thomas for undergraduate education and law school. (*Id.* ¶ 19.) She first met Kaal while an undergraduate. (*Id.*) Because of mutual academic interests, Kaal became a mentor to Howe and was one of the reasons she chose to attend law school at the University of St. Thomas. (*Id.* ¶¶ 19-20.)

Kaal is one of the founders of ETA and DEVxDAO. (*Id.* ¶ 24.) In "late spring or early summer of 2020, Kaal asked Howe if she would be interested in a compliance position with a DAO." (*Id.* ¶ 25.) First, she "informally" attended "weekly community calls, primarily with DEVxDAO and its Grant Program Sponsor, Casper Association," and then, in February 2021, she was hired as a "part-time compliance associate" for ETA, working with DEVxDAO. (*Id.* ¶ 26–28.) When she began this position, she was still in law school and Kaal was her supervisor. (*Id.* ¶ 28.) Howe "was paid by ETA—as were all ETA and DEVxDAO employees/executives." (*Id.* ¶ 31.)

When Howe first began working for ETA, "there was little separation in leadership between" DEVxDAO and ETA. (*Id.* ¶ 32.) The founding members of each entity "were the same individuals." (*Id.*) And ETA's board members and executive directors were also voting associates of DEVxDAO. (*Id.*) In 2021, however, the leaders of the entities "negotiated a new sponsor agreement" with Casper Association, a grant program sponsor of DEVxDAO, that "required separation between ETA and DEVxDAO." (*Id.* ¶¶ 26, 32.) As

a result, some individuals resigned from one entity or the other.  (*Id*. ¶ 32.)  Kaal resigned from ETA but remained a voting associate of DEVxDAO.  (*Id*.)

### B.    Howe Graduates Law School and Joins ETA Full-Time

After graduating from law school, and "at Kaal's urging," Howe joined ETA full-time in August 2021 as the Director of Compliance.  (*Id.* ¶ 33–35.)  Her direct supervisor at this time was Marco Aniballi, ETA's Financial Director and an Executive Board Member.  (*Id.* ¶ 31, 35.)  "Kaal remained her superior and [Howe] continued to work closely with Kaal, who often directed what Howe's duties should be and how they should be done."  (*Id.* ¶ 35.)  In April 2022, ETA elevated Howe to Director of Legal and Compliance.  (*Id.* ¶ 48.)

Howe made EUR 8,000 per month as the Director of Legal and Compliance.  (*Id.* ¶ 49.)  The man "who held this position prior to Howe, and other male individuals at this level (executives), had fixed salaries of EUR 20,000/month, on top of any [voting associate] compensation and grants they received through DEVxDAO[.]"  (*Id.*)  At the time she accepted the Director role, "Howe was told that her pay would be increased to EUR 12,000 [per month] in mid-2023," but ETA ultimately never adjusted her pay.  (*Id.*)

As part of Howe's role, she "was a liaison between DEVxDAO and ETA, working closely with several DEVxDAO" voting associates.  (*Id.* ¶ 53.)  One of those voting associates was Robert Carbone.  (*Id*. ¶ 54.)  Howe and Carbone initially had a "friendly working relationship."  (*Id*. ¶ 55.)

### C.    Puerto Rico Trip and Sexual Assault of Howe

In July 2022, "Howe attended an internal work Summit . . . for DEVxDAO" in Dorado, Puerto Rico. (*Id.* ¶¶ 57–58.) "ETA wanted a representative to attend and asked Howe to attend the Summit on its behalf." (Id. ¶ 59) "ETA had identified numerous topics for Howe to address with the DEVxDAO at the Summit . . . ." (*Id.*) At the time, Howe understood the event as intended to gather "all [DEVxDAO voting associates] who resided in different locations across the world" in order "to discuss and propose topics significant to the continuation of the growth of DEVxDAO and its operations." (*Id.* ¶ 58.) Howe "was made to believe all [voting associates] would be present, but in reality it was a voluntary event for [voting associates.]" (*Id*.)

Howe arrived in Puerto Rico on Thursday, July 21, 2022, and the summit was scheduled to run through the weekend. (*Id.* ¶ 61.) Howe and Kaal, "who were still working together closely at that time, coordinated their return flights to be on the same flight on Sunday, July 24, 2022." (*Id.*) "As the weekend proceeded, it became clear that the Summit was disorganized, and more of a boondoggle than a business meeting." (*Id.* ¶ 62.) Howe was "required to effectively be on-call all hours of the day" during the Summit, but she "quickly realized that most of the Summit's events were social gatherings." (*Id.* ¶ 64.)

On Saturday, July 23, 2022, Howe's colleagues invited her to join other summit attendees on an outing to the International Regatta in San Juan. (*Id.* ¶ 67.) Near midday, while on a dinghy headed to the Regatta, Howe was invited to attend a "business

meeting . . . held on the boat of a public figure." (*Id.* ¶¶ 68–69.)  After the meeting concluded, she found that "the public figure was hosting a party" on the boat.  (*Id.* ¶ 71.)  She also found that her cell phone had run out of battery.  (*Id.* ¶ 70.)

Around sunset, Kaal invited Howe to leave the boat for "the home of one of the blockchain project team members."  (*Id.* ¶ 72.)  There, Howe found herself at another party, although some attendees were discussing business matters.  (*Id.* ¶ 74.)  Several attendees used cocaine.  (*Id.* ¶ 76–78.)  Howe was offered cocaine, but did not use drugs, or consume alcohol, at the party.  (*Id*. ¶ 77)  Because Howe's phone was still out of battery, she could not call her own Uber to return to the hotel.  (*See id.* ¶ 70, 75–76.)

Eventually, "around 11:00 p.m., someone coordinated an Uber back to the hotel for Howe and three of her colleagues, including Carbone."  (*Id.* ¶ 78.)  "Upon arriving back at the hotel, [Howe and three others] rode the elevator up together."  (*Id.* ¶ 79.)  "Howe and Carbone had rooms on the same floor and the other two colleagues had rooms on different floors."  (*Id.*)  "Carbone manipulated Howe into entering his hotel room, where he violently assaulted her and raped her over several hours.  Howe was eventually able to escape from the room."  (*Id.* ¶ 80–81.)

"Unbeknownst to Howe at the time, just days before he assaulted her, Carbone [had] posted intimate photos of a woman online without [her] permission.  This later [led] to his arrest and criminal charges in Connecticut."  (*Id.* ¶ 82.)

Howe initially told no one at ETA of the assault.  (*Id*. ¶ 83.)  However, when Howe and Kaal were sitting next to each other on the plane home the next day, Kaal, "[o]ut of the blue," asked Howe for her thoughts on Carbone.  (*Id.* ¶ 84.)  Howe "relayed a negative impression noting that he was very 'sexually driven,'" but Howe did not tell Kaal about the assault.   (*Id*. ¶ 85.)   Kaal "went on to suggest that if Carbone made Howe uncomfortable, she did not have to work with him."  (*Id*.)  Kaal also stated that "they were already in the process of terminating Carbone for performance-related reasons."  (*Id*.) Howe alleges that "Kaal's comments suggest that he knew or suspected that Carbone had behaved inappropriately."  (*Id.*)

### D.     ETA and DEVxDAO's Response to Howe's Assault

Howe alleges that Kaal told at least one other voting associate, Tony Greenberg, that Carbone had "done something improper to Howe."  (*Id.* ¶ 86.)  Howe also believes "that Kaal was using this knowledge not to actually seek help for Howe, but to further justify his own personal agenda—which was to get rid of Carbone for completely unrelated reasons."  (*Id.*)  These allegations are based in part on an "unexpected[]" video call Howe received from Greenberg on August 12, 2022, approximately three weeks after the assault, in which Greenberg "abruptly asked Howe if Carbone had made any unwanted sexual advances toward her."  (*Id.*)  Howe denied that any advances had occurred, and asked Greenberg to "not discuss this matter with anyone else."  (*Id.* ¶ 86–89.)  However, Howe alleges that Kaal and Greenberg were "develop[ing] a plan to get rid of Carbone," based on "Howe's experience with Carbone" and that "[i]n doing so . . .

[they] revealed sensitive information and speculat[ed] to an unknown number of individuals who were not equipped to handle or investigate such a matter, without Howe's permission[.]"  (*Id.* ¶ 89.)

In late September 2022, Howe ultimately informed her direct supervisor, Aniballi, of the assault.  (*Id.* ¶ 96.)  In a series of calls that followed, Howe was "forced to inform" Kaal and other officers of the assault, "including that Carbone had choked her and sexually assaulted her."  (*Id.* at 98.)  Howe also informed Aniballi that there had been illicit drug use in Puerto Rico.  (*Id.* ¶ 99).  "ETA had no sexual harassment policies, training, or reporting mechanism" (*id.* ¶ 100), and DEVxDAO operated under a disorganized, democratic governing structure, which meant that the entire situation turned into "a very public mess," adjudicated by the "all-male cohort with which Howe worked, stripping her even further of any dignity to conduct business with her colleagues" (*id.* ¶ 89).  Meanwhile at least through September 20, 2022, Carbone still attended weekly ETA/DEVxDAO calls, "even though Kaal . . . had informed Howe . . . that [Carbone] was being removed [for performance-related reasons] . . . and that she would not have to interact with him further as a result."  (*Id.* ¶ 91.)

Ultimately, a "messy" discussion of whether Carbone should be removed from the organization took place in a 32-member "ETA/DEVxDAO Voting Associate Telegram group chat, *of which Howe was a member*."  (*Id.*  ¶ 104 (emphasis in original).)  Initially, a group of members led by Kaal and Greenberg proposed a simple up-or-down vote on whether

to remove a voting associate who had "allegedly breached the ETA code of conduct" (*id.* ¶ 106), but some voting associates objected, questioning whether the removal attempt was legitimate. (*Id.* ¶ 108.) Some participants in the chat joked about the situation, texting things like "drama," "lol what a mess," and other insensitive and offensive comments. (*Id.* ¶ 109).

Eventually, Kaal stated in the group chat that the assault "was discussed on so many calls," and that the vote "was the proposed solution on many calls with the ETA." (*Id.* ¶ 110). Furthermore, Aniballi stated in the group chat, "do you think I'm not briefed on ALL the drama?! This has escaped the DAO and is now public." (*Id.* ¶ 112.) Some members of the group chat expressed disappointment in how the issue was being handled, calling attention to the harm being caused to the victim, who they deduced was very likely in the group chat where all of this was being discussed. (*Id.* ¶ 118–128). The members also discussed whether the group should retain an external law firm or a third-party investigator to handle the situation. (*Id.* ¶ 123.)

Meanwhile, ETA told Howe that "if she wished to make a formal report against Carbone within the organization, Swiss law would require her to publicly accuse Carbone of assault and would open her up to unfettered personal cross examination by Carbone in front of the 36 all-male Voting Associate cohort" and ETA associates. (*Id.* ¶ 130.)

Carbone seemingly was formally voted out on October 24, 2022. (*Id.* ¶ 132.) Carbone filed a federal lawsuit against Kaal and the DEVxDAO in Ohio. (*Id.* ¶ 137.) The

Sixth Circuit affirmed the district court's dismissal for lack of personal jurisdiction over the defendants. *Carbone v. Kaal*, 140 F.4th 805, 807 (6th Cir. 2025).

### E.    Howe Reports the Assault to Police; Alleged Reprisal by ETA

Howe reported the assault to the Washington County Sheriff's Office on October 29, 2022. (*Id.* ¶ 135.) Howe "attempted to make a police report in Puerto Rico but was unable to do so remotely." (*Id.* ¶ 135.) Howe states that "Kaal informed the [ETA] Board that Howe was running around Puerto Rico looking for an attorney" when "she was only searching for an attorney to assist in making a police report in Puerto Rico." (*Id.* ¶ 136.)

"Unbeknownst to Howe," Kaal and other voting associates within ETA/DEVxDAO were "working not only to remove Carbone . . . but also to dissolve the DEVxDAO." (*Id.* ¶ 139.) Once Howe became aware of the purported dissolution of the DEVxDAO, Howe was "tasked with assessing the winding down," and "Kaal indicated Howe would be included in [the] next iteration" of the organization. (*Id.* ¶ 140.) But ultimately, Kaal "led the [voting associates] to shut down the DEVxDAO . . . and use their remaining treasury of approximately 10 million USD . . . to set up a legal defense fund for ten years, providing for full indemnification of each [remaining voting associate] . . . for any litigation the ETA may face." (*Id.* ¶ 141.)

Howe subsequently "noticed a degradation in her role and responsibilities with ETA." (*Id.* ¶ 143.) She was assigned "almost exclusively administrative" duties, and the previously-discussed future opportunities with the group "were now no longer on the table." (*Id.*) She was also "cut off" from other ongoing projects once Kaal "got wind" she

was involved.  (*Id.* ¶ 144.)  Howe was "no longer invited to social events," and "Kaal . . . excluded her" from at least one conference and ignored her in public.  (*Id.* ¶ 145.)

### F.    Alleged Injuries

Howe alleges multiple injuries including diminishment of career growth and opportunities within ETA (*id.* ¶ 147); a reduction in salary (*id.*); physical injuries stemming from the alleged assault, resulting in ongoing symptoms (*id.* ¶ 149–53); post-traumatic stress disorder (*id.* ¶ 154); and reputational harm (*id.* ¶ 155).

## II.    PROCEDURAL HISTORY

Howe filed her Complaint against Defendants on May 1, 2025.  (Docket No. 1.) Howe included 11 causes of action in her Complaint:

Count I—Negligent Hiring, Retention, and Supervision
Count II—Reprisal under the Minnesota Human Rights Act
Count III—Hostile Work Environment under the Minnesota Human Rights Act
Count IV—Violation of the Minnesota Whistleblower Act
Count V—Intentional Infliction of Emotional Distress
Count VI—Negligent Infliction of Emotional Distress
Count VII—Negligent Performance of an Undertaking
Count VIII—Tortious Interference
Count IX—Invasion of Privacy
Count X—Violations of the Federal Equal Pay Act
Count XI— Violations of the Minnesota Equal Pay for Equal Work Act

(*Id.*)  Howe asserts Counts I–VII and IX against Kaal and ETA; Count VIII against only Kaal; and Count X and XI against only ETA.

Defendants move to dismiss on a variety of grounds.  (Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem."), June 16, 2025, Docket No. 12.)  Defendants seek dismissal of Counts I–XI for failure to state a claim; Counts II, III and IX as barred by applicable statutes of limitations; and Counts I, V, VI, VII, VIII, and IX as barred by the exclusivity provisions of the Minnesota Workers' Compensation Act.  Additionally, ETA argues that the Complaint was not properly served, venue is improper, the Court lacks personal jurisdiction over ETA, and that Howe failed to join a required party.

**DISCUSSION**

### I.    STANDARD OF REVIEW

At the motion to dismiss stage, the Court accepts well-pled allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff.  *Schriener v. Quicken Loans, Inc.*, 774 F.3d 442, 444 (8th Cir. 2014).  In addition to the complaint, the Court may consider "those materials that are necessarily embraced by the pleadings."  *Id.*

Rule 12(b) of the Federal Rules of Civil Procedure provides that, at the motion to dismiss stage, a party may assert any of the following defenses: "(1) lack of subject-matter jurisdiction; (2) lack of personal jurisdiction; (3) improper venue; (4) insufficient process; (5) insufficient service of process; (6) failure to state a claim upon which relief can be granted; and (7) failure to join a party under Rule 19."  Fed. R. Civ. P. 12(b).

As noted above, Defendants request dismissal for a number of reasons: the Court lacks personal jurisdiction (over ETA), improper venue and improper service (for ETA),

-12-

failure to state a claim upon which relief can be granted (against ETA and Kaal, for all counts), and failure to join a party under Rule 19.  The Court will first address the standard of review for each of these grounds for dismissal before it addresses the merits.

### A. Personal Jurisdiction

To survive a 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff must plead sufficient facts to support a reasonable inference that the defendant can be subjected to personal jurisdiction.  *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015).  "[T]he action should not be dismissed for lack of jurisdiction if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that the exercise of personal jurisdiction over [the defendant] is proper."  *Id.* at 979.  "To defeat a motion to dismiss for lack of personal jurisdiction, the nonmoving party need only make a prima facie showing of jurisdiction."  *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).  However, conclusory allegations devoid of a factual foundation do not suffice.  *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073–74 (8th Cir. 2004).

The Court may exercise personal jurisdiction over a nonresident to the extent authorized by Minnesota's long-arm statute and consistent with the U.S. Constitution's Due Process Clause.  *Minn. Mining & Mfg. Co. v. Nippon Carbide Indus. Co., Inc.*, 63 F.3d 694, 696–97 (8th Cir. 1995).  Minnesota's long-arm statute authorizes personal jurisdiction "as far as the Due Process Clause of the federal constitution allows."  *Valspar Corp. v. Lukken Color Corp.*, 495 N.W.2d 408, 410 (Minn. 1992).  Therefore, the Court need only

-13-

determine whether exercise of personal jurisdiction here would comport with due process. *See Minn. Mining & Mfg.*, 63 F.3d at 697.

Due process requires sufficient "minimum contacts with the forum state" such that the exercise of jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." *Id.* (citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "The central question is whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum state and should, therefore, reasonably anticipate being haled into court there*." Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 562 (8th Cir. 2003) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In the Eighth Circuit, courts look to "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Burlington Indus., Inc. v. Maples Indus., Inc.*, 97 F.3d 1100, 1102 (8th Cir. 1996). "[D]ue process is satisfied if the defendant has purposely directed its activities at forum residents, and the litigation results from injuries arising out of, or relating to, those activities." *Id.* at 1103.

**B.      Venue**[1]

Rule 12(b)(3) provides that a party may move to dismiss an action when the action is not filed in the proper venue.  Fed. R. Civ. P. 12(b)(3).  The defendant, as the moving party, has the burden of establishing that venue is improper.  *See United States v. Orshek*, 164 F.2d 741, 742 (8th Cir. 1947).

The doctrine of *forum non conveniens* can be employed when the venue, albeit proper, is inconvenient or unacceptable for various reasons.  Under the doctrine of *forum non conveniens*,

> when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or when the chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems, the court may, in the exercise of its sound discretion, dismiss the case, even if jurisdiction and proper venue are established.

*American Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)) (internal quotation marks omitted, alternations in original).  *Forum non conveniens* is applicable only when the alternative forum is abroad, and it vests in the Court the power to abstain from the exercise of jurisdiction even where

---

[1] In their Motion to Dismiss, Defendants indicated they were seeking dismissal for "improper venue."  (Defs.' Mot. Dismiss at 2, June 16, 2025, Docket No. 11.)  In their briefing, however, Defendants state that "ETA moves to dismiss this case under the doctrine of *forum non conveniens*, since a foreign venue—Switzerland—is the most convenient for this litigation." ((Defs.' Mem.  Supp. Mot. to Dismiss ("Defs.' Mem.") at 35, April 23, 2025, Docket No. 9.)

authorized by statute if "the litigation can more appropriately be conducted in a foreign tribunal." *De Melo v. Lederle Labs.*, 801 F.2d 1058, 1060 (8th Cir. 1986).

In *Gulf Oil v. Gilbert,* the Supreme Court provided a nonexhaustive list of factors to must be considered in the *forum non conveniens* equation. 330 U.S. 501, 508–09 (1947). The Court categorized these considerations into "private interest," and "public interest" factors. *Id.* Among the private interest factors are: relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of the premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive. *Piper Aircraft Co. v. Reyno,* 454 U.S. at 241 n.6. The public interest factors included the following: administrative difficulties flowing from court congestion; the forum's interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* (quoting *Gilbert*, 330 U.S. at 508).

### C.    Service of Process

Rule 12(b)(5) allows a party to move to dismiss a complaint for insufficient service of process. Fed. R. Civ. P. 12(b)(5). The standard of proof for a Rule 12(b)(5) motion to dismiss is the same as that used for a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. *Kammona v. Onteco Corp.*, 587 F. App'x 575, 577–78 (11th Cir. 2014), *cert.*

*denied* 575 U.S. 1010 (2015). To survive a motion to dismiss for insufficient service, "a plaintiff must plead sufficient facts to support a reasonable inference that the defendant" has been properly served. *Creative Calling*, 799 F.3d at 979 (internal quotation marks omitted) (*quoting K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 591–92 (8th Cir. 2011)). The plaintiff bears the burden of proof on the issue of service. *Id.* The parties may submit affidavits and evidence "to bolster their positions," but if they do, the "motion is in substance one for summary judgment." *Id.* "At the motion [to dismiss] stage, the action should not be dismissed for lack of [proper service] if the evidence, viewed in the light most favorable to [the plaintiff], is sufficient to support a conclusion that" service was proper. *Id.*

### D.    Failure to State a Claim

In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court considers all facts alleged in the complaint as true to determine if the complaint states a "claim to relief that is plausible on its face." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court construes the complaint in the light most favorable to the plaintiff, drawing all inferences in the plaintiff's favor. *Ashley Cnty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009). Although the Court accepts the complaint's factual allegations as true and construes the complaint in a light most favorable to the

-17-

plaintiff, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986).  In other words, a complaint "does not need detailed factual allegations" but must include "more than labels and conclusions, and a formulaic recitation of the elements" to meet the plausibility standard. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### E.      Joinder

A party moving for dismissal under Rule 12(b)(7) for failure to join a party must demonstrate that the absent party is a "required" party as defined by Rule 19(a), and that joining that party to the litigation is not feasible.[2]  If a required party under Rule 19(a) cannot be joined to the litigation, Rule 19(b) provides factors which the Court must consider to determine whether the litigation can proceed in their absence or should be dismissed.  Fed. R. Civ. P. 19; *Two Shields v. Wilkinson*, 790 F.3d 791, 794 (8th Cir. 2015).

---

[2] Federal Rule of Civil Procedure 19(a)(1) provides that a party is required to be joined if feasible if:
- (A) in that person's absence, the court cannot accord complete relief among existing parties; or
- (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
  - (i) as a practical matter impair or impede the person's ability to protect the interest; or
  - (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

## II.    ANALYSIS

The Court will first address the threshold issues of jurisdictional, venue, and joinder raised by the Defendants and will then turn to whether each count of Howe's complaint can survive a motion to dismiss for failure to state a claim.

### A.    Threshold Issues

#### 1.    Personal Jurisdiction

The Court may only exercise personal jurisdiction over a nonresident like ETA to the extent that the exercise is consistent with the U.S. Constitution's Due Process Clause. Here, the Court concludes that ETA established sufficient minimum contacts with Minnesota such that the exercise of jurisdiction does not offend "traditional notions of fair play and substantial justice." *Minn. Mining*, 63 F.3d at 696–97.

To determine whether ETA's contacts are sufficient, the Court must examine each of the factors in the five-factor test established by the Eighth Circuit,[3] noting that the first three factors are of primary importance. *Burlington Indus.*, 97 F.3d at 1102. The Court finds that the factors weigh in favor of finding personal jurisdiction.

---

[3] The five factors are "(1) the nature and quality of contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) convenience of the parties." *Burlington Indus.*, 97 F.3d at 1102.

ETA recruited and hired Howe while she was a Minnesota resident, and she lived in Minnesota while working for the organization.[4]  It is well-established that where a defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws," personal jurisdiction is proper.  *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 US. 235, 253 (1958)).  ETA's hiring of Howe and continued employment of her in Minnesota provide a large number of contacts with the forum state over a substantial period of time.  Specifically, ETA's conduct and communications with Howe after her assault, which are directly related to the causes of action in this case, took place while Howe was located in Minnesota.

Moreover, Minnesota has a strong interest in providing a forum for its residents—particularly in instances such as this where other forums would be inaccessible or inconvenient to the plaintiff.  *See Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE) Ltd.*, 89 F.3d 519, 525 (8th Cir. 1996) ("Minnesota has an obvious interest in providing a local forum in which its residents may litigate claims against non-residents.").  And, finally, the parties have not articulated why any other forum would be more convenient for ETA while Minnesota is clearly more convenient for Howe.[5]

---

[4] Even considering that ETA contracted with the LLC that it had directed Howe to form instead of Howe directly, that LLC was Minnesota-based.  (*See* Pl.'s Mem. at 20.)

[5] At oral argument, counsel for Defendants noted that although ETA has offices in Switzerland, only one officer lives in Switzerland.

In short, ETA has sufficient contacts with Minnesota to support the Court's exercise of personal jurisdiction.[6]

### 2.      Improper Venue or Forum Non Conveniens

In their Motion to Dismiss, Defendants indicated they were seeking dismissal for "improper venue."  (Defs.' Mot. Dismiss at 2, June 16, 2025, Docket No. 11.)  In their briefing, however, Defendants state that "ETA moves to dismiss this case under the doctrine of *forum non conveniens*, since a foreign venue—Switzerland—is the most convenient for this litigation."  (Defs.' Mem.  at 35.)  The Court will decline to dismiss under either ground.

Under 28 U.S.C. § 1391(a)(2), venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred."  A plaintiff need not show that Minnesota is the "best" venue, *Setco Enters. Corp. v. Robbins,* 19 F.3d 1278, 1281 (8th Cir. 1994), nor must they demonstrate that Minnesota has the most

---

[6] The Court further notes the contrast in ETA's contacts with Minnesota in this case as compared with the Defendants' contacts with Ohio in *Carbone v. Kaal*, where the Sixth Circuit affirmed dismissal of a case Carbone brought against these same Defendants for lack of personal jurisdiction.  140 F.4th 805 (6th Cir. 2025).  In *Carbone*, Carbone's sole argument supporting Ohio's exercise of personal jurisdiction was that Defendants "purposefully availed themselves of the privilege of acting in Ohio by maintaining computer servers there—servers that Defendants used to publish allegedly defamatory statements about Carbone."  *Id.* at 811.  Nothing else connected Defendants to Ohio, nor do they conduct any other business there.  *Id.*  Moreover, Defendants did not even select Ohio as the location for the servers; their agents made that decision.  *Id.*  In contrast, in the case presently before the Court, Defendants purposefully availed themselves of the forum state in recruiting, hiring, and employing a citizen of Minnesota.

substantial contacts to the dispute, *Transocean Group Holdings Pty Ltd. v. S. Dakota Soybean Processors, LLC*, 505 F. Supp. 2d 573, 575 (D. Minn. 2007).  Rather, the Court must simply ask whether the district the plaintiff chose had a substantial connection to the claims at issue, regardless of whether other forums have greater contacts.  *See Setco*, 19 F.3d at 1281.

Because Howe did most of her work for ETA in Minnesota, reported her assault to ETA while in Minnesota, and experienced the repercussions of ETA's conduct while in Minnesota, the Court considers that a substantial part of the events giving rise to the claim occurred in Minnesota and venue is proper.

With respect to *forum non conveniens*, the Court is not convinced that a foreign venue, specifically Switzerland, is the most convenient for this litigation.  It is certainly not more convenient for Howe—she lives in Minnesota, works in Minnesota, and chose Minnesota as a venue when filing her suit.  Kaal—an Illinois citizen and employee at a Minnesota university—does not seem to have any substantial connection to Switzerland.  Nor, as noted above, is the Court convinced that Switzerland is more convenient for ETA (except for its inconvenience for Howe).  Although ETA is headquartered in Switzerland, counsel for Defendants indicated that only one board member is actually located in Switzerland.

With respect to Defendants' argument that "the parties agreed to arbitrate their dispute in Switzerland under Swiss law" (Defs.' Mem. at 34), the Court notes that neither

party has submitted evidence that **Howe** was party to an agreement requiring arbitration or Swiss Law.  Rather, Defendants submitted an agreement—that was not even discussed in the Complaint—between ETA and HHowe Consulting, LLC (Defs.' Mem at 1), an LLC set up by Howe at ETA and Kaal's direction (Pl.'s Mem. Opp. Mot. Dismiss ("Pl.'s Mem.") at 3, July 21, 2025, Docket No. 20).  Defendants' arguments regarding arbitration and choice of law are based on evidence outside of the pleadings and many assumptions that may or may not be correct.  The Court finds that a more fully developed factual record is necessary to properly engage in whether arbitration is required and that a choice-of-law analysis would be premature at this time.

The Court concludes that venue is proper and the doctrine of *forum non conveniens* does not require dismissal.

### 3.      Service of Process

To survive a motion to dismiss for insufficient service, a plaintiff must plead sufficient facts to support a reasonable inference that a defendant has been properly served.  *Creative Calling Sols.*, 799 F.3d at 979.  The Court finds that Howe has plead sufficient facts to support an inference that ETA, a Swiss entity, was properly served by serving Kaal, a member of the ETA Board, and service through the Hague convention was not required.

In *Volkswagenwerk Aktiengesellschaft v. Schlunk*, the Supreme Court held that the "Hague Service Convention" applies only when "the internal law of the forum state defines the applicable method of serving process as requiring the transmittal of

-23-

documents abroad." 486 U.S. 694, 700 (1988). But, "[w]here service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the Convention has no further implications." *Id.* at 707.

Minnesota Rule of Civil Procedure 4.03(c) permits service "[u]pon a domestic or foreign corporation" through "an officer or managing agent, or to any other agent authorized expressly or impliedly . . . to receive service of summons . . . ." Accordingly, the parties seem to agree that this question turns on whether Kaal qualifies an "agent" of ETA for the purposes of service under Minnesota law. Defendants admit that Kaal is "now on the ETA Board" but argue that "Kaal is not an agent of ETA under Minnesota law." (Defs.' Mem. at 36–37.)

Under Minnesota law, "the existence of an agency relationship is generally a question of fact[.]" *New Millennium Consulting, Inc. v. United HealthCare Services, Inc.*, 695 F.3d 854, 857 (8th Cir. 2012).

> [T]wo significant factors have evolved in determining whether a particular individual is a managing agent for service of process: (1) does the individual have the power to exercise independent judgment and discretion to promote the business of the corporation; or (2) is the individual's position of sufficient rank or character to make it reasonably certain the corporation would be apprised of the service.

*Tullis v. Federated Mut. Ins. Co.*, 570 N.W.2d 309, 311 (Minn. 1997).

The Court concludes that, at this motion to dismiss stage, Howe has alleged sufficient facts to support that Kaal was an agent for the purposes of service under Minnesota law. Howe has identified numerous ways in which Kaal had "power to exercise

-24-

independent judgment and discretion to promote the business of the corporation[.]" *Id.* Indeed, Kaal was largely responsible for ETA hiring Howe in the first place. Moreover, Howe has also pled facts that support that Kaal had "sufficient rank . . . to make it reasonably certain the corporation would be apprised of the service," *id.*, including that Kaal was a co-founder (Compl. ¶ 8) and board member of ETA (*see id.* ¶¶ 50, 171).

Accordingly, the Court concludes that at this stage, Howe has pled sufficient facts to support a reasonable inference that ETA was properly served.

### 4.   Joinder

A party seeking dismissal under Rule 12(b)(7) for failure to join a necessary party must first demonstrate that the non-parties are "require[d]" under Rule 19(a). Defendants argue that they cannot "obtain complete relief" unless "HHLLC[7], whose contracts define the roles for Howe and ETA" is joined as a party. (Defs.' Mem. at 40, 41.) The Court disagrees. Defendants have not shown that HHLLC is a required party, nor have they articulated what relief they are seeking or why they would be unable to obtain it if HHLLC Is not joined.

Further, Rule 12(b)(7) and Rule 19 only contemplate dismissal of an action when a party that is required cannot be joined to the litigation and failure to join the party would

---

[7] Defendants use HHLLC as an abbreviation for HHowe Consulting, LLC (Defs.' Mem at 1), an LLC set up by Howe at ETA and Kaal's direction so that ETA could pay her as a contractor rather than an employee (Pl.'s Mem. at 3, July 21, 2025, Docket No. 20).

result in prejudice.[8]  Even if Defendants had clearly articulated why HHLLC should be joined to the litigation, Defendants fail to clearly articulate why HHLLC could not be joined to this litigation or why this lawsuit should be dismissed if HHLLC could not be joined to this litigation.

At best, Defendants' motion to dismiss under Rule 12(b)(7) is premature and will be denied.[9]

### B.     Howe's Claims

Defendants seek dismissal of all counts of Howe's complaint for failure to state a claim.  Defendants move to dismiss Howe's tort claims (Counts I, V, VI, VII, VIII, and IX) under the exclusivity provisions of the Minnesota Workers' Compensation Act. Defendants also move to dismiss Howe's claims for Reprisal and Hostile Work Environment under the Minnesota Human Rights Act (Counts II and III) and Howe's Invasion of Privacy Claim (Count IX) as barred by the relevant statutes of limitations.  The Court will first address Howe's tort claims and then will address her remaining claims.

---

[8] *See, e.g.*, *McGowan v. Tix*, 161 F.4th 1118, 1129 (8th Cir. 2025) ("If a required party under Rule 19(a) cannot be joined, Rule 19(b) calls upon courts to determine 'whether in equity and good conscience, the action should proceed among the existing parties or should be dismissed' based on several factors, including the extent to which a judgment would result in prejudice and provide adequate relief.")

[9] Viewed more cynically, Defendants' motion under 12(b)(7) appears to be an excuse for Defendants to attempt bring in facts and evidence outside of the Complaint which are not relevant at this motion to dismiss stage, including the existence of the LLC created by Howe.

### 1. Tort Claims

The Court will first consider whether Minnesota's Workers' Compensation Act bars

the Court from considering Howe's tort claims. The Court will then consider whether

Howe's tort claims have facial plausibility.

### a. Minnesota Workers' Compensation Act

Minnesota's Workers' Compensation Act was created to ensure prompt and

certain compensation for injuries suffered in the workplace. Minn. Stat. § 176.001 (1994).

"If an employee suffers a personal injury or death arising out of and in the course of her

employment, the Act provides the employee's exclusive remedy." *McGowan v. Our*

*Savior's Lutheran Church*, 527 N.W.2d 830, 834 (Minn. 1995) (citing Minn. Stat. § 176.031

(1994). If the Act provides the employee's exclusive remedy, the Court lacks jurisdiction.

*Id*.

Certain injuries, however, are excluded from coverage under the Act by Minn. Stat.

§ 176.011, subd. 16, commonly referred to as the "assault exception" to the Act. *See*

*McGowan*, 527 N.W.2d*.* at 831. Specifically excluded from coverage are injuries "caused

by the act of a third person or fellow employee intended to injure the employee because

of personal reasons, and not directed against the employee as an employee, or because

of the employment." Minn. Stat. § 176.011, subd. 16.

Assault cases generally fall into three categories:

> (1) those that are noncompensable under the Act because the
> assailant was motivated by personal animosity toward his
> victim, arising from circumstances wholly unconnected with

-27-

the employment; (2) those that are compensable under the Act because the provocation or motivation for the assault arises solely out of the activity of the victim as an employee; and (3) those that are compensable under the Act because they are neither directed against the victim as an employee nor for reasons personal to the employee.

*McGowan*, 527 N.W.2d at 834 (citing *Hanson v. Robitshek–Schneider Co.,* 209 Minn. 596, 600, 297 N.W. 19, 22 (1941)).  For the assault exception to apply, "the acts must not be directed against the employee as an employee.  Or, as articulated in *McGowan*, the acts must be 'wholly unconnected' to the employment."  *Stengel v. E. Side Beverage*, 690 N.W.2d 380, 386 (Minn. Ct. App. 2004) (citing *McGowan*, 527 N.W.2d at 834).  The "'wholly unconnected' standard is in turn a function of analyzing the nature of the employee's job."  *Id.*

Construing the complaint in the light most favorable to Howe, the Court notes that the assault occurred outside of formal work hours and location, and it is unknown on the available facts whether the assault was motivated by personal animosity.  *See Kopet v. Gen. Mills, Inc.*, No. A04-1708, 2005 WL 1021651. At *4 (Minn. Ct. App. May 3, 2005) (affirming denial of summary judgment when there was a genuine issue of material fact whether the assailant's alleged acts were directed against the victim for personal reasons unconnected to employment).  The Court declines to determine at this stage that Howe's assault was or was not "wholly unconnected" to her employment—a determination which, as the *Stengel* court noted, requires analyzing "the nature of the employee's job," 690 N.W.2d at 386, a fact-intensive inquiry beyond the scope of a motion to dismiss.

-28-

In sum, the Court declines to finally resolve whether the assault exception to the Workers' Compensation Act applies, but it will allow certain of Howe's tort claims to proceed, as further outlined below.

### b.        Count I: Negligent Hiring, Supervision, and Retention

Defendants move to dismiss Count I because Howe has failed to state a claim for Negligent Hiring, Retention, and Supervision against ETA or Kaal.  The Court will grant the motion in part (with respect to Howe's claim of negligent hiring) and deny it in part (with respect to Howe's claim of negligent supervision and retention).

"The basic elements of a negligence claim are: (1) existence of a duty of care; (2) breach of that duty; (3) proximate causation; and (4) injury."  *Bjerke v. Johnson*, 742 N.W.2d 660, 664 (Minn. 2007).  Minnesota recognizes the torts of negligent hiring, retention, and supervision.  *Ponticas v. K.M.S. Invs.*, 331 N.W.2d 907, 910–11 (Minn. 1983).

The torts of negligent hiring and retention are derived from an employer's duty to "exercise reasonable care for the safety of members of the general public[.]"  *Ponticas,* 331 N.W.2d at 911.  Employers must "exercise reasonable care in view of all the circumstances in hiring individuals who, because of the employment, may pose a threat of injury to members of the public."  *Id*.  Liability for negligent retention or hiring is

> predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances

of the employment, it should have been foreseeable that the
hired individual posed a threat of injury to others.

*Id*. An essential element of negligent hiring or retention claims is a sufficient "connection between the employment relationship and the plaintiff," such that the "plaintiff comes in contact with the employee as the direct result of the employment, and . . . the employer receives some benefit . . . by the contact[.]" *Id.* The tort of negligent supervision is similar; a plaintiff must show that: "(1) the employee's conduct was foreseeable; and (2) the employer failed to exercise ordinary care when supervising the employee." *C.B. by L.B. v. Evangelical Lutheran Church in Am.,* 726 N.W.2d 127, 136 (Minn. App. 2007) (quotation marks omitted).

Defendants argue that Count I should be dismissed because Carbone was not an employee of ETA, and therefore ETA cannot be held liable for his intentional torts. Defendants further argue that even if Carbone was an employee, Howe did not plead any facts that "suggest Defendants had any knowledge of a risk posed by Carbone," and therefore Howe did not sufficiently plead that they breached a duty of care. (Defs.' Mem. 11.)

As an initial matter, the Court will reject Defendants' contention that because Carbone was not an employee of ETA, ETA cannot be held liable for his intentional torts. The Minnesota Supreme Court has described, "the law will impose a duty on A to protect B from C's criminal acts if there is a special relationship between A and B. In such a relationship, B has in some way entrusted his or her safety to A and A has accepted that

entrustment." *State v. Back,* 775 N.W.2d 866, 870 (Minn. 2009) (internal quotation marks and citation omitted).  Under the doctrine of respondeat superior, from which the torts of negligent hiring, retention, and supervision arise, a duty of care arises not from the formation of a traditional employee/employer relationship, but from the common-law standard that "[a] person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless." Restatement (Second) Agency § 213 (1958).  Although it is possible that Defendants will ultimately prove such a master/servant relationship did not exist here, the Court finds that Howe's Complaint plausibly alleges that such a relationship did exist such that it gave rise to vicarious liability for Carbone's intentional torts.

With respect to Defendants' contention that they did not breach their duty of care in hiring, retaining, or supervising Carbone, the Court finds that Howe has sufficiently alleged claims of negligent retention and supervision, but Howe did not plead facts to support her claim of negligent hiring.

Considering all facts alleged in the Complaint as true, the Complaint plausibly alleges that Kaal and ETA knew of the potential that Carbone would behave inappropriately and be a danger to others, particularly women, and that they acted negligently in retaining Carbone and failing to exercise sufficient supervision, particularly in the unique setting of the Puerto Rico trip but in the weeks following the trip as well. Specifically, the Complaint alleged that at the time of the flight back from Puerto Rico,

Kaal already "knew or suspected that Carbone had behaved inappropriately" (Compl. ¶ 84); that Carbone had posted intimate photos of another woman without her permission prior to the trip (*id.* ¶ 82); and that Kaal was already in the process of trying to remove Carbone prior to the trip (*id.* ¶ 86). Thus, the Court will deny Defendants' motion to dismiss with respect to Howe's claim of negligent supervision and retention.

Howe does not, however, allege any facts that would support a claim that Defendants acted negligently in hiring Carbone in the first instance. The Court will, therefore, grant Defendants' motion to dismiss with respect to Howe's claim of negligent hiring.

### c. Negligent or Intentional Infliction of Emotional Distress

Defendants ask the Court to dismiss Howe's claims for negligent and intentional infliction of emotional distress (Counts V and VI, respectively). The Court will grant Defendants' motion with respect to these claims because, as further explained below, Howe does not adequately allege the elements of these torts.

### i. Count V: Intentional Infliction of Emotional Distress

Minnesota recognizes the tort of intentional infliction of emotional distress ("IIED") as defined in the Restatement (Second) of Torts. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (citing Restatement (Second) of Torts § 46(1) (1965)). IIED consists of four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 438–39

(Minn. 1983); *see also* Restatement (Second) of Torts § 46(1) (1965).  The Minnesota Supreme Court has "cautioned" that IIED claims must be "sharply limited to cases involving particularly egregious facts and that a high threshold standard of proof is required to submit the claim to a jury."  *Langeslag*, 664 N.W.2d at 864 (internal quotation marks omitted).

"Extreme and outrageous" conduct must be "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  *Hubbard*, 330 N.W.2d at 439.  "Emotional distress" is "severe," for the purposes of prongs three and four if "the distress inflicted is so severe that no reasonable [person] could be expected to endure it."  *Id.* (quoting Restatement (Second) of Torts § 46, comment j).

Considering all facts alleged in the Complaint as true, Kaal and ETA's conduct in response to Howe's report of sexual assault was outrageous.  Howe was not awarded confidentiality, even when she was told to expect it.  (*See* Compl. ¶¶ 88, 89, 100–102.)  Howe was expected to continue to interact with Carbone even after reporting his misconduct.  (*Id.* ¶ 103.)  Howe's allegations and Carbone's conduct were discussed by more than 30 voting associates of DEVxDAO and associates of ETA on a group chat of which Howe was a member (*id.* ¶¶ 104, 109) and in numerous calls among individuals Howe considered colleagues.  (*id.* ¶ 110).  Moreover, a sophisticated, multi-national business organization failed to have sexual harassment policies, training, or reporting

mechanisms in place (*see id.* ¶ 100), resulting in all voting associates of DEVxDAO being informed that "Howe was the victim" (*id.* ¶ 132).

However, Howe did not adequately allege that her emotional distress in response to these events was severe. "Just as the plaintiff must meet a high threshold of proof in proving the extreme nature of the conduct, the plaintiff must also meet a high threshold of proof regarding the severity of the mental distress." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 868 (Minn. 2003). While Howe alleged that she had "anxiety attacks every time she had to have a call" with Carbone during August and September (*id.* ¶ 90), Howe does not allege what emotional distress she suffered (or if there were any physical effects) **after** she reported the assault at the end of September. Thus, while the Court finds that Kaal and ETA's conduct in response to Howe's report of sexual assault was outrageous, Howe did not allege what emotional distress she suffered as a result of this specific conduct or if that distress was severe. Accordingly, the Court will grant Defendants' motion to dismiss with respect to Howe's claim for intentional infliction of emotional distress.

### ii.  Count VI: Negligent Infliction of Emotional Distress

"To establish a claim for negligent infliction of emotional distress, a plaintiff must show that she was within a zone of danger of physical impact, reasonably feared for her safety, and suffered severe emotional distress with accompanying physical manifestations." *Wall v. Fairview Hosp. and Healthcare Servs.,* 584 N.W.2d 395, 408

(Minn. 1998). The "zone of danger is limited to actual physical danger caused by the defendant's negligence." *Id.* Negligent infliction of emotional distress claims, in other words, involve "a plaintiff . . . experience[ing] a reasonable anxiety, with physical symptoms, 'from being in a situation where it was abundantly clear that plaintiff was in grave personal peril for some specifically defined period of time. . . .'" *Id.* (quoting *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995)).

Howe alleges that she was "in the zone of danger of physical impact when she was subjected to Carbone's sexual assault on a work trip for ETA in Puerto Rico." (Compl. ¶ 218.) But an essential element of a negligent infliction of emotional distress claim is that "[f]ortune smiled and the imminent calamity did not occur." *Wall*, 584 N.W.2d at 395 (quoting *K.A.C. v. Benson*, 527 N.W.2d 553, 558 (Minn. 1995)). "A plaintiff is in a zone of danger when physical harm might occur, but fortunately does not." *Id.* Howe does not allege that she "merely in a zone of danger" with Carbone; she alleges that "she was in fact physically harmed by his abuse." *Id.* (holding a psychiatric nurse's recurrent failure to prevent a psychiatrist's abuse of patient would not support patient's claim for negligent infliction of emotional distress because patient was not merely in a zone of danger with psychiatrist but was in fact physically harmed by his abuse). A claim of negligent infliction of emotional distress is, therefore, an ill fit for the facts of this case.

Because Howe has not pled facts sufficient to support a claim of negligent infliction of emotional distress by ETA or Kaal, the Court will grant Defendants' motion to dismiss her claim for negligent infliction of emotional distress.

### d.       Count VII: Negligent Performance of an Undertaking

Defendants move to dismiss Howe's claim of negligent performance of an undertaking. Howe alleges that ETA and Kaal undertook the responsibility of investigating Howe's report of sexual assault, and breached Howe's privacy by negligently spreading confidential information. (Compl. ¶¶ 224–230.) The Court will grant Defendants' motion because Howe does not adequately allege the elements of a negligent performance of an undertaking claim.

The Minnesota Supreme Court has recognized that tort liability for negligent performance of an undertaking arises when:

> One who gratuitously undertakes with another to do an act or to render services which he should recognize as necessary to the other's bodily safety and thereby leads the other in reasonable reliance upon the performance of such undertaking
>
> (a) to refrain from himself taking the necessary steps to secure his safety or from securing the then available protective action by third persons, or
>
> (b) to enter upon a course of conduct which is dangerous unless the undertaking is carried out, is subject to liability to the other for bodily harm resulting from the actor's failure to exercise reasonable care to carry out his undertaking.

*Abresch v. Northwestern Bell Tel. Co.*, 75 N.W.2d 206, 210–11 (Minn. 1956) (internal quotation marks omitted) (quoting Restatement, Torts, § 325).[10]  The court stated that this rule applies to "bodily injury . . . as well [as] to property damage."  *Id.*

Howe alleges that Defendants' botched investigation of the sexual assault gives rise to a negligent performance of an undertaking claim; but she does not allege that the investigation, regardless of whether it was mishandled, lead her to suffer additional **bodily** injury or harm.  Because Howe's does not adequately allege the elements of this tort claim, the Court will grant Defendants' motion to dismiss Howe's negligent performance of an undertaking claim.

### e.    Count VIII: Tortious Interference

Defendants move to dismiss Howe's tortious interference claim against Kaal, primarily arguing that Howe has pled her claim "more as negligence on Kaal's part" and contending that Minnesota does not recognize the tort of negligent interference with prospective economic advantage.[11]  (Defs.' Mem. at 15.)  The Court disagrees.

---

[10] "[S]ince its decision in *Abresch,* the [Minnesota] supreme court has adopted the Restatement (Second) of Torts § 324A and has applied all three bases of liability contained in section 324A when addressing liability to a third party after an assumption of a duty. *Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus*, 801 N.W.2d 193, 199 (Minn. Ct. App. 2011).  But § 324A, like § 325, also requires resulting "physical harm."  Restatement (Second) of Torts § 324A.

[11] Defendants also argue that "because one cannot interfere with its own contract, an employer cannot be sued for tortious interference by its former employee." (Defs.' Mem. at 15.)  But, as Howe does not assert a claim of tortious interference against ETA, this argument is inapposite.

Howe's interference claim falls under the umbrella of "tortious interference with prospective economic advantage." *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA. Inc.,* 844 N.W.2d 210, 219 (Minn. 2014). This claim can arise from "the wrongful interference with noncontractual as well as contractual business relationships." *Witte Transp. Co. v. Murphy Motor Freight Lines, Inc.*, 193 N.W.2d 148, 151 (Minn. 1971). These claims "must be limited to those circumstances in which the interference is intentional and independently tortious or unlawful, rather than merely unfair." *Gieseke,* 844 N.W.2d at 218. Under Minnesota law, plaintiffs must prove five elements to prevail on an interference with prospective economic advantage claim: (1) the plaintiff possessed "a reasonable expectation of economic advantage;" (2) the Defendant knew of that expectation; (3) the defendant "intentionally interfered with plaintiff's reasonable expectation of economic advantage," in a manner that "is either independently tortious" or is unlawful under statute or regulation; (4) "it is reasonably probable that plaintiff would have realized" her economic advantage absent Defendant's interference; and (5) "plaintiff sustained damages." *Id*.

The Court finds that Howe's complaint plausibly alleges each of these elements, including that Kaal interfered with Howe's noncontractual prospective economic business relationships, including her relationship with ETA. The Court will, therefore, deny Defendants' motion to dismiss Howe's tortious interference claim.

### f.    Invasion of Privacy (Count IX)

Defendants move to dismiss Howe's claim against Kaal and ETA for invasion of privacy.  The Court will grant Defendants' motion with respect to this claim because Howe's Complaint fails to sufficiently allege each element of this tort.

Howe's invasion-of-privacy claim is for the tort of "publication of private facts," which occurs when someone "gives publicity to a matter concerning the private life of another . . . if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998) (quoting Restatement (Second) of Torts, § 652B (1977)).

Defendants inaccurately assert that Howe failed to allege that her private information was shared outside the DEVxDAO.  Howe's Complaint does allege that at least some information was "disseminated to members of the public outside of ETA and DEVxDAO." (Compl. ¶ 240; *see also id.* ¶ 112.)  What Howe does not allege, however, is that the information shared was "of a kind that . . . would be highly offensive to a reasonable person."  *Lake*, 582 N.W.2d at 233.  Indeed, Howe does not allege what information was shared outside of ETA and DEVxDAO.  (*See* Compl. ¶ 112 (stating that Aniballi entered a Telegram chat that stated "[t]his has escaped the DAO and is now public" but not further defining what information had been made public).)  Nor does Howe allege how many people outside of DEVxDAO voting associates were aware of the (undefined) private facts. *Cf. Robbinsdale Clinic, P.A. v. Pro-Life Action Ministries*, 515

-39-

N.W.2d 88, 92 (Minn. Ct. App. 1994) ("[E]ven where invasion of privacy claims are recognized, they are generally not allowed where private facts are only communicated to a single person or a small group of people[.]").

The Court will, therefore, grant Defendants' motion to dismiss Howe's invasion of privacy claim.[12]

*　　*　　*

In conclusion, the Court finds that the Minnesota's Workers' Compensation Act does not bar the Court from considering Howe's tort claims at this stage.  However, because Howe has failed to adequately plead all of her tort claims, the Court will allow only Howe's negligent supervision and retention claim and her tortious interference claim to proceed.

### 2.    Minnesota Human Rights Act Claims

The Court will next consider Howe's claims against Kaal and ETA of reprisal[13] and hostile work environment[14] under the Minnesota Human Rights Act (MHRA).  Defendants argue that because (1) Howe was an independent contractor, not an employee, she

---

[12] Defendants also request that the Court dismiss Howes' invasion of privacy claim because it is time-barred. The parties, however, disagree on whether a two-year or six-year statute of limitations applies to the tort of invasion of privacy.  Because the Court will dismiss this claim on other grounds, it will decline to opine on the applicable statute of limitations.

[13] *See* Minn. Stat. § 363A.15.

[14] *See* Minn. Stat. § 363A.08.

-40-

cannot claim protection of the MHRA; (2) if the MHRA was applicable, Howe's claims would be barred by the statute of limitations; and (3) in any event, Howe has not suffered an adverse employment action.  The Court will address each argument in turn below.

### a.    Independent Contractor

Defendants submitted a copy of an agreement between ETA and HHowe Consulting, LLC that, they argue, proves Howe was a contractor, not an employee.  (*See* Defs.' Mem at 1, 18.)   But, at the motion to dismiss stage, the Court accepts the Complaint's factual allegations as true and construes the complaint in a light most favorable to the plaintiff, and Howe clearly alleged that she was an "employee of ETA and DEVxDAO" (Compl. ¶ 160) and she was "misclassified as an independent contractor for ETA when she was in actuality an employee given ETA's control over Plaintiff's means and manner of performance" (*id.* ¶¶ 158, 184, 197, 205).  Although Howe may be found to be an independent contractor at a later stage of this proceeding, the Court will accept as true at this stage that Howe was an employee of ETA and, thus, could claim the protections of the MHRA.

### b.    Statute of Limitations

Defendants also move to dismiss Howe's reprisal and hostile work environment claims under the MHRA because they are barred by a one-year statute of limitations.  *See* Minn. Stat. § 363A.28, subd. 3(a) ("A claim of an unfair discriminatory practice must be brought as a civil action . . . within one year after the occurrence of the practice.").  Howe counters that her claims are timely under the MHRA because of the continuing violations

doctrine. *See, e.g., Sigurdson v. Isanti Cnty.*, 448 N.W.2d 62, 66 (Minn. 1989); *Brotherhood of Ry. & S. S. Clerks, Freight Handlers, Exp. & Station Emp., Lodge 364 v. State by Balfour*, 229 N.W.2d 3, 12 (Minn. 1975).

i.   **Count II: Reprisal**

Howe alleges that Kaal and ETA engaged in reprisal by assigning Howe to a "lesser position in terms of wages, hours, and job security." (Compl. ¶ 176.) Defendants argue that this claim should be dismissed because it is barred by the one-year statute of limitations. To survive at this motion to dismiss stage, Howe must allege that the reprisal occurred within one year of filing her complaint.

In the Complaint, Howe states that her most recent paycheck from ETA was received in January 2025 and that it was less than $200 (Compl. ¶ 179) while, before her report of assault, she had made EUR 8,000 per month (*id.* ¶ 49). Although Howe's duties and hours changed dramatically in the two years prior to her filing her Complaint, those changes—as well as the changes in pay—could be a reprisal. *See* Minn. Stat. § 363A.15 ("It is an unfair discriminatory practice for any individual who participated in the alleged discrimination as a perpetrator, employer, . . . or employee or agent thereof to intentionally engage in any reprisal against any person[.] . . . It is a reprisal for an employer to . . . transfer or assign the individual to a lesser position in terms of wages, hours, job classification, job security, or other employment status . . . . ").

Because Howe received her last paycheck in January 2026, her reprisal claim is sufficiently pled within one year of filing of her complaint. Thus, the Court finds at this motion-to-dismiss stage, Howe has adequately alleged a continuing violation such that the statute of limitations does not bar her reprisal claim.

### ii.        Count III: Hostile Work Environment

Defendants also move to dismiss Howe's hostile work environment claim under the MHRA because it is barred by the one-year statute of limitations.

A plaintiff bringing a hostile work environment claim under the MHRA must show: "(1) they are a member of a group that has protected status under the [MHRA]; (2) they were subject to unwelcome harassment; (3) the harassment was based on their membership in a protected group; and (4) the harassment affected a term, condition, or privilege of their employment." *Henry v. Ind. Sch. Dist. #265*, 988 N.W.2d 868, 881 (Minn. 2023). Howe alleges the following facts: she is female (Compl. ¶ 185), a protected class under the MHRA; she was sexually assaulted because of her sex (*id.* ¶ 188); "the sexual assault . . . was sufficiently severe or persuasive that a reasonable person in [Howe's] position would find the work environment to be intimidating, hostile, and offensive" (*id.* ¶ 189); and ETA "fail[ed] to take prompt and appropriate action to correct the behavior" (*id.* ¶ 191).

Although Howe alleges in her Complaint that "Defendants' actions are part of a continuing violation of the Minnesota Human Rights Act, as their retaliatory conduct

continues to this very day" (*id.* ¶ 192), the Complaint does not identify what "retaliatory conduct" or ongoing violations she is suffering **because she is female**. *See Papasan*, 478 U.S. at 286 (noting that the Court is "not bound to accept as true a legal conclusion couched as a factual allegation"). Thus, the Court finds that Howe has not adequately alleged a continuing violation with respect to her hostile work environment claim, and the statute of limitations bars this claim.

### c.    Adverse Employment Action

Finally, Defendants argue that Howe's claims under the MHRA should be dismissed because Howe has not suffered an adverse employment action.

"Under the MHRA, to establish a prima facie case for a reprisal claim, a plaintiff . . . must establish the following elements: '(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two.'" *Bahr v. Capella Univ.*, 788 N.W.2d 76, 81 (Minn. 2010). "An adverse employment action must include some tangible change in duties or working conditions." *Id.* at 83.

Howe pled numerous changes in her duties and working conditions after she reported being sexually assaulted including a change in work responsibilities, a change in pay, an alteration in her expectations for promotion, and changes in how she was treated by her colleagues. In short, she has adequately pled conduct sufficient to support an adverse employment action at the motion-to-dismiss stage.

*    *    *

-44-

Because Howe has not adequately alleged a continuing violation and the statute of limitations bars her hostile work environment claim under the MHRA, the Court will grant Defendants' motion to dismiss this claim. The Court will, however, allow Howe's reprisal claim under the MHRA to proceed.

### 3.   Count IV: Minnesota Whistleblower Act Claim

Minnesota's whistleblower statue provides that an employer shall not "discharge, discipline, penalize, interfere with, threaten, restrain, coerce, or otherwise retaliate or discriminate against an employee," because the employee, "in good faith, reports a violation, suspected violation, or planned violation of any federal or state law or common law or rule . . . to an employer[.]" Minn. Stat. § 181.932, subd. 1; *Kidwell v. Sybaritic, Inc.,* 784 N.W.2d 220, 226 (Minn. 2010).

As with Howe's claims under the MHRA, Defendants argue that Howe was a contractor, not an employee and that Howe suffered no adverse employment action by either Kaal or ETA.

First, as noted above, although Howe may be found to be an independent contractor at a later stage of this proceeding, the Court finds that Howe has pled facts sufficient to plausibly allege that she was an employee of ETA, and thus could claim the protections of the Minnesota Whistleblower Act.

Second, as discussed above with respect to Howe's claims under the MHRA, the Court finds that Howe has alleged facts sufficient to plausibly allege an adverse employment action in violation of the Whistleblower statue.

Because the Court concludes that Howe's Complaint alleges a plausible claim for violations of whistleblower protections, the Court will deny Defendants' motion to dismiss this count.

### 4. Counts X and XI: Equal Pay Claims

Howe brings equal pay claims against ETA under federal and state law.  The Court will deny ETA's motions to dismiss these counts because Howe has sufficient alleged discrimination in her Complaint.

Under the Federal Equal Pay Act, a "prima facie case of discrimination based upon unequal pay . . . must show that [the employer] paid male workers more than [the plaintiff] was paid for equal work in jobs that required equal skill, effort, and responsibility and were performed under similar conditions."  *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 513 (8th Cir. 1995).

Similarly, Minnesota statute provides that:

> No employer shall discriminate between employees on the basis of sex by paying wages to employees at a rate less than the rate the employer pays to employees of the opposite sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to a seniority system, a merit system, a system which measures earnings by quantity or quality of production, or a differential based on any other factor other than sex.

Minn. Stat. § 181.67, subd. 1.  The "[Minnesota Equal Pay Act] does not require plaintiffs to prove that an employer acted with discriminatory intent; plaintiffs need show only that

an employer pays males more than females." *Ewald v. Royal Norwegian Embassy*, 82 F. Supp. 3d 871 (D. Minn. 2014) (quoting *Bauer v. Curators of the Univ. of Mo.*, 680 F.3d 1043, 1045 (8th Cir. 2012) (internal quotation marks omitted)).

Howe alleges that that the previous, male Director of Legal Compliance was paid significantly more than her.  Yet Defendants state that the "Complaint provides no information as to whether . . . [they were] a contractor like Howe, the person's credentials or experience, or even the duties this person supposedly performed."  (Defs.' Mem. at 22.)  Defendants also state that Howe erroneously compares her pay to individuals with positions that are not substantially similar to her own.  *See Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 719 (8th Cir. 2000) ("[T]o establish a prima facie case of wage discrimination based on unequal pay, a plaintiff must show that the defendant paid male workers more than she was paid for equal work in jobs that required equal skill, effort, and responsibility and were performed under similar conditions.")

Nevertheless, the Court finds that Howe's allegations meet the required threshold to bring an unequal pay claim at this stage.  Howe alleges a EUR 16,000 difference in pay between herself and her male predecessor, and whether the two jobs required equal skill and whether Howe's credentials or experience were different will require discovery and further development of the facts.  The Court will, therefore, deny Defendants' motion to dismiss Howe's equal pay and equal work act claims.

**CONCLUSION**

The Court will grant in part and deny in part Defendants' motion to dismiss Howe's Complaint against Wulf Kaal and ETA.  Because the Court finds that jurisdiction is proper, it will not dismiss the Complaint in full.  The Court will dismiss several counts without prejudice because Howe has failed to state a claim or the underlying claims is barred by the relevant statute of limitations.  While several other counts may proceed, the Court cautions all parties against citing or alluding to additional facts and documents beyond the scope of the record, as both sides have done at this stage.[15]

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss [Docket No. 11] is **GRANTED in part** and **DENIED in part**, as follows:

1.   **GRANTED in part** and **DENIED in part**, with respect to Count I—Negligent Hiring, Retention, and Supervision:

   a.   **GRANTED** with respect to Negligent Hiring;

   b.   **DENIED** with respect to Negligent Retention and Supervision;

2.   **DENIED** with respect to Count II—Reprisal under the Minnesota Human Rights Act;

---

[15] When submitting any future motions, the parties—particularly Defendants—are reminded of the importance of the meet and confer requirement under Local Rule 7.1(a).

3.   **GRANTED** with respect to Count III—Hostile Work Environment under the Minnesota Human Rights Act;

4.   **DENIED** with respect to Count IV—Whistleblower Protection under the Minnesota Whistleblower Act;

5.   **GRANTED** with respect to Count V—Intentional Infliction of Emotional Distress;

6.   **GRANTED** with respect to Count VI—Negligent Infliction of Emotional Distress;

7.   **GRANTED** with respect to Count VII—Negligent Performance of an Undertaking;

8.   **DENIED** with respect to Count VIII—Tortious Interference;

9.   **GRANTED** with respect to Count IX—Invasion of Privacy;

10.  **DENIED** with respect to Count X—Violations of the Federal Equal Pay Act;

11.  **DENIED** with respect to Count XI— Violations of the Minnesota Equal Pay for Equal Work Act.

DATED: March 10. 2026                         _____/s/ John R. Tunheim_____
at Minneapolis, Minnesota.                           JOHN R. TUNHEIM
                                                 United States District Judge

-49-